# HANNAH SNUFFER, Appellant, v. GEORGE SNUFFER, Respondent.

In the Kansas City Court of Appeals, April 2, 1923.

1. **SEPARATE MAINTENANCE:** Divorce: Indignities: Work Voluntarily Assumed by Wife Held Not to Afford Sufficient Basis for Charge of Indignities Such as to Render Her Life Intolerable, or Such as to Endanger Her Life and Health. Where plaintiff, wife of a farmer, worked in the fields on some occasions and sometimes aided in pulling stumps and in caring for hay, *held* that as such work was not required of plaintiff by her husband, but voluntarily

assumed by her, it did not afford sufficient basis for a charge of indignities such as to render her life intolerable or such as to endanger her life and health.

2. ———: ———: ———: Evidence Held Insufficient to Substantiate Allegations of Wife as to Indignities and Cruelty of Husband, Justifying Trial Court in Dismissing Petition and Rendering Judgment for Husband Thereon. In a suit by wife for separate maintenance, evidence *held* to disclose complete failure of proof to substantiate allegations of her petition charging husband with such indignities and cruelty as to justify decree, and there was no error in dismissing her petition and rendering judgment for defendant.

Appeal from the Circuit Court of DeKalb County.—*Hon. Alonzo D. Burnes,* Judge.

AFFIRMED.

*Hewitt & Hewitt* for plaintiff.

*E. G. Robison* and *Randolph & Randolph* for defendant.

ARNOLD, J.—This is a suit for separate maintenance. Plaintiff and defendant were married September 18, 1892, and lived together as husband and wife upon a farm in DeKalb County until June 27, 1921, excepting for a period of a very few days about nine or ten years prior to the final separation, as above indicated, at which time plaintiff left defendant. The suit is based upon the provisions of section 7314, Revised Statutes 1919.

The petition charges defendant was guilty of such indignities as to render plaintiff's condition intolerable and that his treatment of plaintiff was so cruel as to endanger her life and health. The indignities charged are that defendant was of a crabbed and ugly disposition, parsimonious and stingy, and that he became more so as the years of married life passed; that he scoffed at plaintiff's religion, refused to take plaintiff and her

daughters to Sunday School and church, and would require them, when going to church and Sunday School to take a balky and unreliable team of horses; that he referred to the members of her church as "damned Baptists" and that at divers times said "the damned Baptists" should not come on his place, and used other expressions derogatory to her church and its members and called the church she attended a "rogue's gallery." That defendant had an old pistol about the house for which he purchased loaded cartridges; that he charged plaintiff with being unfaithful to him; that defendant is of a brutal nature in that he abused and beat his cattle and other stock; that he beat one horse with an iron chain and broke another's leg; that he beat one cow with a billet of wood and broke the leg of another; that he endeavored to induce one of their daughters to break her church vows and return to worldly ways; that he showed dislike for one of their daughters, and without cause drove said daughter from home; that he refused to provide for and clothe plaintiff and their minor daughters; and that plaintiff was thereby compelled to provide clothing for herself and said minor daughters notwithstanding defendant was financially able to do so; that defendant was sullen and angry and refused to talk to plaintiff for weeks; that defendant was possessed of inordinate passion and compelled plaintiff to submit to his embraces so frequently as to impair her health and endanger her life. The petition further alleges that by reason of the above charges plaintiff was compelled to separate herself from defendant's bed and board.

The prayer is that plaintiff "may remain and live separate and apart from defendant, and that he be required to maintain and support her." The petition further charges that plaintiff is without means to prosecute this action, and support herself and her two minor children; and that defendant is possessed of lands and other properties of the value of $20,000.

The answer admits the marriage as pleaded in the petition, and denies each and every other allegation therein contained.

A motion by plaintiff for suit money and maintenance was sustained by the court and the amount fixed at $50 per month from October, 1921. At the close of all the evidence the court found that plaintiff was not entitled to the relief prayed and entered judgment dismissing plaintiff's bill. After an unsuccessful motion for a new trial, plaintiff appeals. Plaintiff verbally moved the court for an award of alimony pending the appeal, which said motion was by the court sustained, and an order continuing the alimony theretofore granted was entered of record. From this order defendant appeals to this court, which said appeal will be determined in a separate opinion.

The only point for our consideration in plaintiff's appeal is whether, under the evidence of record, the trial court erred in dismissing plaintiff's bill, and this involves a more or less extended review of the evidence. We have carefully read the entire record and learn that plaintiff was about seventeen years of age at the time of her marriage with defendant who was almost twice her age. The parties lived on a farm during their entire married life. Defendant inherited forty acres of land from his father and afterwards acquired eighty acres more by purchase, and at the time of the institution of this suit, and prior thereto, there was a comfortable eight-room house on said farm. The farm work was conducted by both plaintiff and defendant in the usual manner of farmers. There were born to this union one son and four daughters, all being reared upon this farm and all except two being of legal age at the time this suit was filed. The testimony shows that, as is usual with Missouri farmers, the family had a large garden, raised horses, cattle, hogs, poultry, and that all members of the family engaged in the duties of the farm, the children attending school. The wife, at times, worked

in the garden, had charge of the poultry and sold the products thereof, retaining the proceeds as her own.

The petition charges and the testimony shows that plaintiff worked in the fields on some occasions; that she sometimes aided in pulling stumps and in caring for hay; that she also helped to saw wood and worked in the garden. But the petition does not charge, nor does the testimony show that plaintiff was required by defendant to do this work. Plaintiff testified that she helped defendant on a few occasions in unloading hay from the wagon by placing the fork in the hay which then was lifted by horse power to the position desired. The testimony further shows that plaintiff's part in pulling stumps consisted in placing the chain around the stumps, or in driving the horses hitched to the power. Her work in the garden can justly be accepted as nothing more than is customary among farmer's wives.

It is apparent that none of the duties above mentioned, voluntarily assumed by plaintiff, afford sufficient basis for a charge of indignities such as to render her life with defendant intolerable, or that they were such as to endanger her life and health.

As to the maiming of the stock the testimony fails to show conclusively that such maiming was done in such a spirit of brutality as to sustain plaintiff's charges that defendant was of a brutal nature. No testimony was offered showing that defendant broke the shoulder of a cow, as stated in the petition. Neither plaintiff nor any of her witnesses saw defendant strike the cow. Defendant testified the cow fell on the road away from home and thus injured herself. There is also a charge that defendant broke the leg of a horse. Defendant testified that he could not catch the horse which was unbroken, that he used a rope loop, catching the animal by the leg and that in her struggling, she fell and broke her leg. Defendant is corroborated in these statements by the son who was present at the occurrence.

There is another charge to the effect that defendant set the dog onto some ducks belonging to the daughter Effie, against whom defendant is alleged to have entertained a prejudice. The testimony is that the ducks were upon a sled load of corn and that a pup five or six months old ran them away, but there is no proof that defendant was to blame for this act of the dog. The charge is denied by defendant. The testimony likewise fails to show that defendant ever refused to permit plaintiff to have a team to drive to church, and there is evidence that on some occasions he drove to church and Sunday School with plaintiff and his children, both by team and in his car.

Many charges are made against defendant which we deem too trivial and unwarranted to merit discussion herein. The allegation that defendant was of a crabbed and ugly disposition is more or less indefinite, but in support thereof, it was attempted to be shown that at times he would not talk. The testimony shows that his chief offense in this respect lay in the fact that he would not respond to the wordy attacks directed against him by plaintiff.

Again, there is the charge that defendant accused plaintiff of being unfaithful to him. This refers to an incident following the birth of the youngest child, a girl, when a relative, in the presence of both plaintiff and defendant, remarked on the beauty of the child. Defendant's remark that she might not be his child, the evidence shows, was jokingly made. This remark seems not to have been offensive to plaintiff at the time it was made and apparently was not so regarded by her until after the final separation. In our opinion all these incidents were of such trivial nature as utterly to fail to furnish a basis for the charges they were intended to establish.

Coming to the incidents immediately preceding the final separation, as we view the testimony, defendant was fond of his youngest child and had for her several

endearing names, calling her at times the "little bum."
On the occasion in question, when he came down stairs
to breakfast, plaintiff and the daughter, Effie, were pres-
ent. Defendant inquired "Where is little bum?" There
is nothing in the evidence even tending to show that
the remark was intended to be other than a jocular one,
and the term applied to the child one of endearment.
Plaintiff, however, resented it and administered to de-
fendant some verbal chastisement. At this point, the
daughter, Effie, joined in the altercation and the word
battle from that time on waged between the father and
daughter. Defendant testified his daughter called him
a liar when he referred to the fact that his son had said
he had heard Effie swear, and suggested that her con-
nection with the church might stop this habit. The tes-
timony tends to show that the defendant then told Effie
that if she called him a liar again, he would "slap her
jaws." The daughter then suggested that if he did so,
she would leave home.

The testimony of plaintiff on this point is to the
effect that defendant then told the daughter to leave,
bu this is denied by defendant. We think the father was
justified in verbally reproaching his daughter for her
remarks, and moreover, he might even have been justi-
fied in adopting more efficacious measures. At any rate,
the daughter left the home and has not since returned
there to live. Plaintiff testified that this circumstance
was tantamount to driving Effie from home. We can-
not accept this view of the incident as detailed by the
evidence.

From this stage in the family turmoil, it is gathered
plaintiff began her preparations to leave, and in fur-
therance of this object, she took part of her belongings
and placed them along a hedge in a neighbor's field, from
whence she later removed them to another home. A
few days thereafter, she sent two trucks to carry her
property away from the family home. The testimony
shows that defendant told her to take away anything she

wanted while the trucks were there. Plaintiff acted on the suggestion, moved away with her belongings, and brought this suit for separate maintenance. The evidence further shows that defendant afterwards sent word to plaintiff that he would welcome her home any time she chose to come. He repeated this sentiment on the witness stand at the trial.

There is also the charge in the petition that defendant was possessed of excessive sexual passion and that his demands and indulgences in this respect were so frequent as to endanger plaintiff's health. In the opinion of this court this is the only charge approaching an indignity. The testimony tends to show that plaintiff and defendant had not occupied the same bed for a period of more than three years up to December, 1920, and that during this period there were no sexual indulgences between them; that during the winter of 1920-21, the husband and wife slept together for a short time, plaintiff again leaving his bed in February, 1921, and that thereafter there were no such relations between them. It is obvious that plaintiff has failed to prove this charge, and further comment is unnecessary.

The charge that defendant failed and refused to purchase clothing for his children is attempted to be proved by the relation of one incident where the daughter Effie needed a pair of over-shoes. These were purchased by defendant and delivered to Effie about two weeks after the request therefor was made. The testimony on this charge further is to the effect that plaintiff, at times, bought some clothing for the children from her own funds. This is such a usual practice in married life that we must hold it does not even tend to prove that defendant was parsimonious.

Section 1301, Revised Statutes 1919, provides, among other grounds for divorce, that where either party "shall be guilty of such cruel or barbarous treatment as to endanger the life of the other, or shall offer such indignities to the other as shall render his or her condition

intolerable . . . ." etc. In construing this statute the courts have held that the evidence must show that the acts complained of are such as to endanger life, limb or health, and that such danger will naturally arise from continued commission of such acts. [Maget v. Maget, 85 Mo. App. 6.] It has been held that acts of cruelty may not be sufficiently grave to endanger life, and yet may amount to such indignities as to render plaintiff's condition intolerable, and that as to what constitutes indignities will depend upon the facts of each case. "For an indignity to be intolerable in a statutory sense, it must amount to a species of mental cruelty." [Goodman v. Goodman, 80 Mo. App. 274.] In the case of Holschbach v. Holschbach, 134 Mo. App. 247, 257, 114 S. W. 1035, it is said: "For the marital relation to endure amidst the cares of life, with their irritating effects on nerves and temper, reasonable forgiveness must be practiced and a conciliatory spirit cultivated. Disagreements and even grievances occur between good men and good women, who by practicing forbearance, will on the whole get along well together. This is the spirit of the law regarding divorce."

The testimony herein discloses a complete failure of proof on the part of plaintiff to substantiate the allegations of her petition and we must hold there was no error in the ruling of the trial court in dismissing her petition and rendering judgment for defendant thereon.

The judgment is affirmed. All concur.